UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 4:19-CR-301-SDJ |
| | § | **SEALED** |
| JOSE ANTONIO CARRETO (1) | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Jose Antonio Carreto's Amended Motion for New Trial, (Dkt. #163), in which Carreto seeks a new trial with respect to Counts 1 and 3 of the indictment.[1] The Government filed a response. (Dkt. #168-SEALED). The Court, having considered the motion, the Government's response, the record, and the applicable law, **DENIES** the amended new-trial motion and the relief requested.

### I. BACKGROUND

**A. Carreto and Watson Are Indicted on Charges of Drug Trafficking Resulting in Serious Bodily Injury**

On September 25, 2019, a sixteen-year-old girl, M.T., overdosed on heroin and nearly died on the shoulder of the President George Bush Turnpike in Plano, Texas. M.T.'s life was saved when the Plano Police Department and Fire Department, responding to an emergency call, administered Narcan—a medication used to counter the effects of opioid overdoses—to her.

---

[1] Carreto's Amended Motion for New Trial clarifies that he is seeking a new trial on counts one and three of the indictment, rather than just on count three of the indictment as originally requested. Accordingly, Carreto's Motion for New Trial, (Dkt. #162), is **DENIED as moot.**

1

Later, when M.T. was questioned by the Plano Police Department, she stated that Kolton Watson sold her the heroin that caused her to overdose. Posing as a friend of M.T., Plano PD Detective Erik Ahrens arranged for Watson to sell heroin to an undercover officer. Shortly after the sale was consummated, Watson was arrested. After receiving his *Miranda* warnings, Watson was questioned by Ahrens and other officers, including Weldon Thompkins, a Plano PD Detective and Task Force Officer with the Drug Enforcement Administration. The interview was recorded, and the video and transcript were introduced as exhibits in Defendant Jose Antonio Carreto's trial.

Watson was cooperative both prior to and throughout the interview. He also gave the arresting officers consent to search his room, where drug paraphernalia was found, and his cell phone. Watson stated that he had only been selling heroin for approximately 4-5 weeks and that he purchased approximately 9-12 grams of heroin per week. Watson identified his source of heroin as an individual he knew as "Kid." Watson was expressly asked if he purchased heroin from anyone else when Kid was not available.

> Detective Thompkins:  Who else—who else do you buy from when he's not available?
>
> Watson:  He's always available.
>
> Thompkins:  He [sic] always available?  He's you're [sic] only plug?
>
> Watson:  Every time I've called him, he's always answered. I've never had to wait on him.  Tr. Ex. 44B at 80.

After his arrest, Watson cooperated with Detective Ahrens to coordinate a purchase of heroin from Kid. Officers with Plano PD conducted a traffic stop of Kid prior to his arrival at the sale. A search of Kid's car revealed approximately 12 grams of heroin. Kid was later identified as Jose Antonio Carreto.

On November 13, 2019, a grand jury returned a three-count indictment against Carreto, Watson, and Carreto's brother, Isauro Carreto-Cruz. The indictment charged all three defendants with conspiracy to possess with the intent to distribute and distribution of heroin resulting in serious bodily injury in violation of 21 U.S.C. § 846 (count one), and possession with the intent to distribute and distribution of heroin resulting in serious bodily injury and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (count three). The indictment also charged Carreto and his brother Carreto-Cruz with conspiracy to possess with the intent to distribute and distribution of methamphetamine in violation of 21 U.S.C. § 846 (count two).

In September 2020, Watson entered into a plea agreement with the Government, pleading guilty to count three of the indictment. On May 4, 2021, the Court sentenced Watson to 240 months imprisonment and dismissed the remaining counts. At his sentencing hearing, the Court asked Watson if he had reviewed the presentence investigation report ("PSR"), discussed the PSR with his counsel, and understood the PSR. Additionally, the Court asked Watson if the PSR adequately covered his background and if Watson was satisfied with the accuracy of the PSR. Watson responded in the affirmative to the Court's questions. The PSR provides that

law enforcement officers searched Watson's cellphone and "identified Jose Antonio Carreto (Carreto) as a person who supplied heroin to Watson on September 22, 2019, which was later distributed to the minor and caused her overdose." (Dkt. #88-SEALED, ¶ 7).

**B. Carreto Goes to Trial and Watson Testifies**

Carreto and Carreto-Cruz proceeded to trial before a jury on May 24, 2021. At trial, Carreto stipulated that he sold heroin and methamphetamine, but he contested whether his sale of heroin resulted in serious bodily injury. Consistent with her prior statements to police, M.T. confirmed that she purchased the heroin responsible for her overdose from Watson and that she did not purchase heroin from anyone else on the day of her overdose. Detective Ahrens testified about his interview with M.T., his arrest of and interview with Watson, and the arrest of Carreto. Notably, Detective Ahrens testified that the statement Watson made during his interview that Carreto was always available to supply heroin to Watson was consistent with the Plano Police Department's investigation. Detective Ahrens also confirmed that Watson's text messages and telephone records supported Watson's statement that Carreto was Watson's only heroin supplier. Trial Tr., (Dkt. #135), pp. 473–99.

Watson also provided testimony at the trial. On direct examination, cross-examination, and re-direct examination, Watson repeatedly affirmed that Carreto was his sole source of heroin. On direct and re-direct examination by the Government, Watson stated as follows:

> Q:   At the time that you were arrested, was Jose Carreto your sole source of supply?

A: Yes, sir.

Q: Were you getting heroin from any other source?

A: No, sir.

Q: Were you getting heroin from Colby?

A: No, sir.

******

Q: And at the time of your arrest, was it at that point where you were receiving half an ounce?

A: Yes, sir.

Q: And how often were you receiving half an ounce from Jose Carreto?

A: Every three to four days.

******

Q: And significantly, that date of September 22nd, was that the last time that you received drugs from the defendant?

A: Yes, sir.

******

Q: And did you sell to [M.T.] on September 25th, 2019?

A: Yes, sir.

Q: And what quantity did you sell to her that day?

A: Uh, half a gram.

Q: Okay. And that quantity that you sold to her that day, where did it come from?

A: Kid.

> Q: So it came from Jose Carreto to you, and you sold it to her.
>
> A: Yes, sir.
>
> Q: Okay. And you didn't have any other sources of supply; correct?
>
> A: No, sir.
>
> Q: So that heroin didn't come from any other individual other than Jose Carreto.
>
> A: Correct.
>
> ******
>
> Q: So what you've told this jury here today is the truth; correct?
>
> A: Yes, sir.
>
> Q: That you received—the heroin that you received, and you gave to [M.T.] came from Jose Carreto; correct?
>
> A: Correct.

Trial Tr., (Dkt. #138), pp. 853–55; 862; 867; 923.

On cross-examination, Watson testified to the same effect:

> A: But I do believe that the heroin I sold [M.T.] caused her to overdose.
>
> ******
>
> Q: Okay. So I want to move forward to your dealings with heroin. Jose was not always your supplier; correct?
>
> A: When it was drugs that I was reselling, he was.
>
> ******

6

> Q: Okay. So the last time that we know for certain that you re-upped with Jose was September the 22nd, which was three days before the overdose; right?
>
> A: Correct.
>
> Q: But at the time that you debriefed or proffered, I believe is what we call it, you told them one to two days.
>
> A: Yeah. That was just an estimate.
>
> Q: Is it possible that you were being truthful about the time and not truthful about where you got your stuff?
>
> A: No. I was being truthful.

Trial Tr., (Dkt. #138), pp. 896; 898; 918–19.

Watson additionally testified to his eligibility for a reduction in his offense level for accepting responsibility for participating in the offense of conviction. Watson testified as follows:

> Q: Did you understand that in order to receive acceptance of responsibility, you had to be truthful and complete in your information?
>
> A: Yes, sir.
>
> Q: Including your testimony here today.
>
> A: Yes, sir.
>
> Q: Do you understand that if you're not, there could be consequences to you not being truthful and complete?
>
> A: Yes, sir.
>
> Q: And you know that other charges could be filed against you.
>
> A: Yes, sir.
>
> Q: Such as perjury or obstruction of justice?

> A: Yes, sir.
>
> Q: Lying to a federal agent?
>
> A: Yes, sir.
>
> Q: But knowing all those things, you still agreed to this agreement and signed it after reviewing it with your attorney.
>
> A: Yes, sir.

Trial Tr., (Dkt. #138), pp. 887–88.

Finally, Watson testified about his interactions with the attorneys for the Government and Detective Ahrens:

> Q: All right. Have myself, Ms. Bloss, Ms. Pickett, Investigator Ahrens, promised you anything in exchange for your testimony here today?
>
> A: No, sir.
>
> Q: Have we told you if you testify here today, we guarantee you a month off, a year off, two years off, anything of that nature?
>
> A: No, sir.
>
> Q: Now, was our instruction to you to be 100 percent truthful?
>
> A: Yes, sir.
>
> Q: All right. And was that the only instruction that we gave you?
>
> A: Yes, sir.
>
> Q: And we've met with you several times; is that correct?
>
> A: Yes, sir.

> Q: How many times have we met with you?
>
> A: Three.
>
> Q: And during those conversations with you, did we tell you that you had to get somebody convicted?
>
> A: No, sir.
>
> Q: Did we tell you that you had to testify a certain way?
>
> A: No, sir.
>
> Q: Did we give you the answers to any of the questions that I've posed to you?
>
> A: No, sir.
>
> Q: Did we simply ask you some questions, and you gave us some answers?
>
> A: Yes, sir.
>
> Q: Okay. Now, being a hundred percent truthful, are you hopeful that you get some sort of reduction or consideration for your testimony here today?
>
> A. Yes, sir.
>
> Q: But nothing's been guaranteed to you; correct?
>
> A: Yes, sir.

Trial Tr., (Dkt. #138), pp. 890–91.

On June 1, 2021, the jury found Carreto and codefendant Isauro Carreto-Cruz guilty of counts one, two, and three of the indictment. With respect to counts one and three, the jury specifically found beyond a reasonable doubt that M.T. suffered serious bodily injury that resulted from the use of heroin of which Jose Antonio Carreto was part of the distribution chain.

### C. Months After Carreto's Trial Concluded, Watson Sends Letters to Counsel and the Court Indicating That His Testimony Was Untruthful

Months after Carreto's trial concluded, on November 13, 2021,[2] Watson sent a letter to counsel for the Government, Colleen Bloss, stating, in pertinent part, as follows:

> The decision to cooperate/testify was not one of my own but that came from constant pressure and false threats. I have sent a more lengthy explanation to Judge Jordan.

(Dkt. #168-2 SEALED). On the same date, Watson also sent a letter to the Court.[3] Watson's letter to the Court states as follows:

> While in Fannin County Detention Center last year i [sic] informed my attorney i [sic] had no desire to cooperate with the Government or testify in my codefendants trial. Shortly thereafter i [sic] was visited by my Attorney, Ms. Collen [sic] Bloss and Mr. Ernest Gonzales [sic]. During this meeting after respectfully stating my desicion [sic] not to cooperate and testify i [sic] was threatened that if i [sic] didn't i [sic] would be supoeaned [sic] and if still not willing, the government would file new charges including contempt of court and/or purgary [sic]. . . . Had it not been for being threatened i [sic] would not have agreed to cooperate and testify.

(Dkt. #153-SEALED).

On January 16, 2022, Watson sent a second letter to Ms. Bloss, stating the following:

> . . . i [sic] was not telling the truth when being asked any questions ethier [sic] in or out of court. I lied because i [sic] feared getting a twenty year sentence and was told my only chance of getting time off was cooperating. I . . . want no part in being a tool used for aiding someones [sic] political gain by helping them get a conviction. I shouldnt [sic] have

---

[2] Watson's letter is incorrectly dated November 13, 2020.

[3] Like the letter directed to the Government, Watson's letter to the Court is also incorrectly dated November 13, 2020.

10

>lied but my attorney did not want to take no for an answer when trying to get me to cooperate.

(Dkt. #157-SEALED).

On February 21, 2022, Carreto filed a motion for new trial, (Dkt. #162), which was clarified the following day in his amended motion for new trial, (Dkt. #163). In his amended motion for new trial, Carreto moves for a new trial based on newly discovered evidence, *i.e.*, Watson's statement in his letter that he did not provide truthful responses to questions either in or out of court. Carreto contends that if Watson was not telling the truth at trial, then some other person could have supplied the heroin to Watson who then sold it to M.T., implying that there might be a reasonable doubt that M.T. suffered serious bodily injury that resulted from the use of heroin of which Carreto was part of the distribution chain.[4] Carreto has requested an evidentiary hearing.

## II. LEGAL STANDARD

Under Rule 33 of the Federal Rules of Criminal Procedure, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). If, as here, the motion for new trial is based on newly discovered evidence, the motion "must be filed within 3 years after the verdict." FED. R. CRIM. P. 33(b)(1).[5]

---

[4] In his letters, Watson vaguely references pressure to cooperate with the Government and to testify on behalf of the Government. Watson also alludes to pressure from his own counsel to cooperate with the Government. Carreto, however, only focuses on Watson's broad statement of untruthfulness. Accordingly, the Court limits its discussion and analysis to the arguments raised by Carreto in his amended new-trial motion.

[5] Carreto's motion for new trial is timely.

11

"Motions for new trials based on newly discovered evidence are disfavored by the courts and therefore are viewed with great caution." *United States v. McClaren*, 13 F.4th 386, 416 (5th Cir. 2021) (internal quotation marks and citation omitted), *cert. denied sub nom. Fortia v. United States*, 142 S.Ct. 1244 (2022). To receive a new trial for newly discovered evidence, a defendant must satisfy the following prerequisites: "(1) the evidence was newly discovered and unknown to the defendant at the time of the trial; (2) failure to detect the evidence was not a result of lack of due diligence by the defendant; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence will probably produce an acquittal." *United States v. Ardoin,* 19 F.3d 177, 181 (5th Cir. 1994) (internal citation omitted). A defendant who fails to demonstrate any one of these factors is not entitled to a new trial and the motion should be denied. *United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004) (internal citation omitted), *cert. denied*, 544 U.S. 978, 125 S.Ct. 1874, 161 L.Ed.2d 730 (2005).

### III. Discussion

At the outset, the Court notes that Carreto's new-trial motion turns on three letters from Watson, one letter sent to the Court and two letters sent to one of the Government's lawyers that prosecuted Watson and Carreto. The letters, sent in November 2021 and January 2022, include Watson's broad, unsworn assertions that he lied in statements that he made both in courtroom proceedings and outside of court concerning the subject matter of this case. Significantly, Watson fails to specify what portions of his in-court testimony or statements made outside of court are untrue.

Although Watson's letters are unsworn, for the purpose of evaluating Carreto's motion the Court will assume *arguendo* that the letters are evidence.[6] The Court further concludes that the letters are newly discovered, were unknown to Carreto at the time of trial, and there was no failure to detect this evidence because the letters were sent by Watson months after Carreto's trial concluded. The questions before the Court therefore are whether Watson's letters present material evidence, not merely cumulative or impeaching evidence, and whether such evidence will probably produce an acquittal. *Ardoin,* 19 F.3d at 181.

**A. Is the Evidence Material, not Merely Cumulative or Impeaching?**

Carreto argues that Watson's broad statements of untruthfulness in his letters constitute material evidence. In Carreto's view, Watson's general assertion that he lied in courtroom proceedings and in statements made outside the court should be construed to mean that Watson is specifically saying some other person, not Carreto, supplied heroin to Watson and that this unidentified person could be responsible for the heroin Watson sold to M.T. that ultimately caused her serious bodily injury.

Carreto's reliance on Watson's letters is misplaced. Because the only evidentiary purpose for Watson's letters is to impeach his own testimony, they are not material. *McClaren*, 13 F.4th at 416–17 (citing *United States v. Eghobor*, 812 F.3d 352, 363 (5th Cir. 2015)) (explaining that "[n]ewly discovered evidence is not material if its only evidentiary purpose is to impeach trial testimony"). "Mere impeachment evidence that only casts doubt on the veracity of a witness's testimony and

---

[6] Watson did not swear to the contents of the letters under oath, nor have any affidavits been filed with the Court concerning Watson's allegations.

demonstrates a bias on his part 'is insufficient to entitle a defendant to a new trial.'" *Id.* at 417 (quoting *Eghobor*, 812 F.3d at 363); *see also United States v. Garcia-Esparza*, 388 F.App'x 407, 408 (5th Cir. 2010) (explaining that evidence produced to show a witness "lied extensively on the witness stand . . . is impeaching and not a basis for a new trial").

At the time of his arrest, during trial, and at his sentencing hearing, Watson admitted, testified and otherwise repeatedly confirmed that Carreto was his sole heroin supplier. *See supra* Part I.A–B. While Watson later appeared to distance himself from his prior admissions and trial testimony generally, he did so without specificity. Watson's vague, broad statement of untruthfulness is, therefore, not material because its only evidentiary purpose would be to generally impeach all of his prior in-court testimony. For this reason, the Court finds that Watson's letters are merely impeaching, not material.

### B. Will the Evidence Probably Produce an Acquittal?

With respect to the final factor, the Court must determine if Watson's statements will probably produce an acquittal. In regard to this factor, Carreto again contends that if Watson was not telling the truth at trial, then some other person could have supplied the heroin to Watson who then, in turn, sold it to M.T., thereby creating a reasonable doubt that M.T. suffered serious bodily injury resulting from the use of heroin of which Carreto was part of the distribution chain.

14

Carreto's argument is unpersuasive. To begin with, the Fifth Circuit has long viewed even sworn affidavits recanting prior testimony with "extreme suspicion." *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005) (collecting cases). Given this precedent, *a fortiori*, Watson's unsworn letters making broad and vague assertions that his testimony in court was untruthful are to be considered with deep skepticism. Further, Watson's letters stand alone, unsupported by any other evidence that the facts to which Watson testified at trial were untrue. For example, even if Watson's general statement that he was untruthful at trial were construed as a reference to his testimony that Carreto was his sole heroin supplier, Watson provides no alternate source or further corroborating details implicating another supplier, nor is there any other "newly discovered" evidence on this issue. Finally, leaving aside his testimony, Watson's own text messages and telephone records admitted into evidence at trial showed that Carreto was Watson's only heroin supplier.

In sum, Watson's vague and unspecific assertions that he was not being truthful at trial do not provide evidence that would probably produce an acquittal. The Court views Watson's letters with extreme suspicion, particularly when compared to (1) Watson's consistent testimony at trial and in other court proceedings confirming that Carreto was his sole source of heroin, and (2) the additional evidence at trial establishing that Carreto was Watson's only heroin supplier.

\* \* \*

For the foregoing reasons, the Court concludes that Carreto has not satisfied the following prerequisites to receive a new trial based on newly discovered evidence:

15

(1) the evidence is not material because it is impeaching; and (2) the evidence will probably not produce an acquittal. Accordingly, Defendant Jose Antonio Carreto's Amended Motion for New Trial, (Dkt. #163), will be denied.

Carreto's request for an evidentiary hearing will also be denied. In his Amended Motion for New Trial, Carreto asks for an evidentiary hearing for a single purpose: "to examine Watson under oath as to whether he lied specifically about a second source [of heroin]." (Dkt. #163). The Court does not agree that an evidentiary hearing is necessary. "[T]he decision to hold a hearing rests within the sound discretion of the trial court." *United States v. Blackburn*, 9 F.3d 353, 358 (5th Cir. 1993) (citing *United States v. Chagra*, 735 F.2d 870, 873 (5th Cir. 1984)), *cert. denied*, 513 U.S. 830, 115 S.Ct. 102, 130 L.Ed.2d 51 (1994). Furthermore, "[a] motion for a new trial can ordinarily be ruled upon without conducting an evidentiary hearing." *United States v. Simmons*, 714 F.2d 29, 30 (5th Cir. 1983). "[T]he acumen gained by the trial judge in presiding over the course of the trial makes Rule 33 motions directed to the same judge particularly suitable for ruling without a hearing." *United States v. MMR Corp.*, 954 F.2d 1040, 1046 (5th Cir. 1992) (internal quotation marks and citation omitted). Courts typically reserve evidentiary hearings on motions for new trial for unique situations involving allegations of jury tampering, prosecutorial misconduct, or third-party confessions. *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). Given this Court's familiarity with the trial proceedings and evidence at issue, and the fact that Carreto's purported grounds for a new trial do not

involve allegations of jury tampering, prosecutorial misconduct, or third-party confessions, the request for an evidentiary hearing is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Jose Antonio Carreto's Amended Motion for New Trial, (Dkt. #163), is **DENIED**.

**So ORDERED and SIGNED this 25th day of April, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE